UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
MARIA D'AGOSTINO,

                        Plaintiff,             **MEMORANDUM AND ORDER**

          — against —                 10-CV-1120 (SLT) (VMS)

LA FITNESS INTERNATIONAL, LLC. d/b/a
a/k/a LA FITNESS, INC., LA FITNESS, LA
FITNESS SPORTS CLUBS, MICHAEL SHARP,
and PRO RESULTS a/k/a BODY OF CHANGE
d/b/a LA FITNESS, a wholly owned subsidiary of
Defendant, LA FITNESS, INC.,

                       Defendants.
------------------------------------------------------------X

**TOWNES, United States District Judge:**

      Maria D'Agostino ("Plaintiff") brings this action against LA Fitness International, LLC. d/b/a a/k/a LA Fitness, Inc., LA Fitness, LA Fitness Sports Clubs, Michael Sharp, and Pro Results a/k/a Body of Change d/b/a LA Fitness (together "Defendants") alleging age and gender discrimination in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq., Title VII of the Civil Rights Act of 1964 ("Title VII") and the Age Discrimination in Employment Act ("ADEA") as well as retaliation under the NYSHRL. Defendants have moved for summary judgment, alleging that they acted appropriately in demoting Plaintiff. For the reasons that follow, the court grants Defendants' motion in its entirety.

I. S<small>TANDARDS OF</small> R<small>EVIEW</small>

      Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F<small>ED</small>. R. C<small>IV</small> .P. 56(a). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation marks omitted).

      The moving party bears the burden of showing that no genuine issue of fact exists. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The non-movant cannot avoid

summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990) (internal quotation marks and citations omitted). Moreover, the disputed facts must be material to the issue in the case, in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998). "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks omitted) (alteration in original).

## II. B<span>ACKGROUND</span>

The parties do not dispute the following facts which are construed in a light most favorable to Plaintiff, the non-moving party. On January 3, 2007, Plaintiff, forty-seven years old at the time, began her employment as a Training Assistant Manager ("TAM") at the Lake Success, New York facility for LA Fitness – a nationwide network of sports clubs. (Defendants' Statement of Facts ("Defs. SOF") ¶ 1.) TAMs are responsible for selling personal training sessions and are promoted in large part based on their ability to achieve sales goals. (Id. ¶ 2.) Michael Sharp, as District Vice President, was responsible for monitoring personal training sales. (Id. ¶ 3.) On or about August 9, 2007, Sharp promoted Plaintiff to Weekend General

Manager ("WGM"), which was approved by Dorian Gallagher, Regional Vice President.[1] (Id. ¶¶ 5-6; Plaintiff's Statement of Facts ("Pl. SOF") ¶ 5.) Plaintiff was promoted in light of her sales figures and received a transfer to LA Fitness' Staten Island facility because she had requested to be closer to her home. (Defs. SOF ¶ 6.) As WGM of the Staten Island facility, Plaintiff was responsible for running the weekend sales team, supervising trainers, setting schedules, and participating in the interview process for new hires. (Id. ¶ 8.) In February of 2008, after approximately six months as the WGM at the Staten Island facility, Gallagher again promoted Plaintiff to Training General Manager ("TGM") on a probationary basis. (Id. ¶ 11.) As TGM, Plaintiff was responsible for overall sales at the club, sales training, supervising the sales staff, hiring and firing, training of physical trainers, and training TAMs to be promoted to WGMs. (Id. ¶ 9.) TGMs receive medical benefits and are placed on a different salary and bonus structure than WGMs and TAMs, who do not receive medical benefits. (Id. ¶ 10.) As TGM, Plaintiff reported directly to Sharp. (Pl. SOF ¶ 6.)

Over the course of her tenure as TGM, Plaintiff alleges that Sharp made several comments disparaging her in particular and women in general. (Defs. SOF ¶ 49; (Pl. SOF ¶¶ 7, 8, 9-10.) In addition to these remarks, Plaintiff alleges that her younger male counterparts received preferential treatment. (Defs. SOF ¶ 50; Pl. SOF ¶¶ 11-13.) On November 11, 2008, Plaintiff sent an email to Linda Bessant, Employee Relations Manager in LA Fitness' Human Resources department. (Defs. SOF ¶ 14; Ex. G Attached to Defendants' Motion for Summary Judgment ("Defs. MSJ").) In that email, Plaintiff complained about a recent conference call that she had been on with Sharp and other TGMs. Plaintiff referred to Sharp's tone as "loud," and

---

[1] In her statement of facts, Plaintiff disputes Defendants' assertion that Sharp was involved in the decision to promote her to WGM. (Plaintiff's Statement of Facts ("Pl. SOF") ¶ 15.) Plaintiff herself, however, testified to this fact in her deposition. (*See* Pl. Dep. at 15 (testifying that Mike Sharp and Dorian Gallagher promoted her to weekend general manager); *see also* Sharp Dep. at 74 (testifying that he promoted Plaintiff to the Training Weekend Manager position at Staten Island).) The court will therefore credit Defendants' assertion that Sharp was involved in Plaintiff's promotion to the WGM position.

3

characterized his statements as "demoralizing, insulting, degrading, and threatening." (Defs. SOF ¶ 14; Ex. G Attached to Defs. MSJ.) Plaintiff also referred to Sharp's "verbal abuse and profanity," although there is no indication that Plaintiff believed she was the victim of discrimination. (Defs. SOF ¶ 14.) In any event, in that email, Plaintiff indicated that the episode was "not the first time," and that she had "had enough," and was "so weary" that she "[could] not accept this treatment any longer." (Ex. G Attached to Defs. MSJ.) That same day, Plaintiff appears to have filed a formal complaint against Sharp with Human Resources complaining about his abusive conduct. (Ex. M Attached to Defs. MSJ) (November 30, 2008 email from Plaintiff referring to her November 11, 2008 complaint against Sharp for treating her in a "demoralizing, threatening, insulting, and belittling way.").

On Tuesday, November 18, 2008, Plaintiff received an email from Sharp seeking to discuss "the direction we are currently heading in Staten Island, and what gameplan [Plaintiff] had in mind to implement to turn it around." (Ex. I Attached to Defs. MSJ at 2.) Sharp included in the email sales data comparing LA Fitness' Staten Island facility to the national average for all its clubs. (Id.) Sharp admonished Plaintiff that he "need[ed] to see improvement . . . Not only improvement in numbers, but improvement in manpower and staff quality." (Id.) In this regard, Sharp noted that he was currently interviewing TAMs to fill the WGM position to help alleviate some of Plaintiff's staffing concerns, but asked Plaintiff to send him "an email of your gameplan for turning [the facility's sale numbers] around and let [him] know what interviews [Plaintiff had] scheduled for the near future." (Id. at 3; Defs. SOF ¶ 33.) Plaintiff responded to Sharp's email, advising him that she was aware of her responsibilities and was "performing at 100% of [her] potential." (Ex. I Attached to Defs. MSJ at 2.) Plaintiff also indicated that she was "well aware of where [the Staten Island facility's] numbers are and where they need to be." (Id.) She did not send him a game plan. Following her response to Sharp's email, Plaintiff forwarded the conversation to Bessant for her "file with H[uman] R[esources]." (Id. at 1) Plaintiff indicated to Bessant that she found it "out of character" for Sharp to communicate via email, as in the past

4

he would simply relentlessly call managers' cell phones. (Id.) Plaintiff made it clear that she was forwarding the email because she felt she had to protect herself. (Id.)

On Thursday, November 20, 2008, Sharp emailed Bessant regarding "a complaint that was made against [him] by [Plaintiff]." (Defs. SOF ¶ 31.) Sharp indicated that Gallagher and Mark Gralnick, LA Fitness' Executive Vice President, brought the complaint to his attention and that they both "instructed [him] what to do moving forward." (Defs. SOF ¶ 32.) Sharp stated that he was aware that the complaint accused him of creating a hostile work environment for Plaintiff, but stated that the accusation was "totally untrue," and that Plaintiff was "just feeling too much pressure for being held accountable while her club is less than 20% of goal." (Ex. M Attached to Defs. MSJ.) Sharp further indicated that Gralnick had "instructed" him on Monday, November 17, to send Plaintiff an email "touching base with her about where her numbers currently compare to the national averages." (Id.) Sharp also explained that he had spoken to Gralnick to "make sure [he was] protected as an employee from action if [Plaintiff] were to take [Gallagher's] conversation the wrong way" and that Gralnick had suggested that he touch base with Bessant. (Id.)

On November 24, 2008, Plaintiff again emailed Bessant "just for [her] records," complaining that Sharp had commented to two other employees that she was "probably on [her] way out." (Defs. SOF ¶ 20; Ex. J Attached to Plaintiff's Opposition ("Pl. Opp.").) Plaintiff also complained that she still had no WGM at her facility and that she believed Sharp was "setting [her] up for failure." (Ex. J Attached to Pl. Opp.) On or around that same day, Plaintiff also testified that she called Bessant and had a call with her, Michu Welch, and a third party whose name Plaintiff could not recall.[2] In that call, Plaintiff avowed that she felt she was being discriminated against because of her age. (Plaintiff's Deposition ("Pl. Dep.") at 90.) In addition, although Plaintiff stated that she did not "use the words" that she was being discriminated

---

[2] It is unclear from the record what position Welch held at LA Fitness, but that fact is not material to the instant motion.

5

against because of her gender, she says she did indicate more generally that she felt she was being discriminated against. (Id. at 89-90.) Plaintiff acknowledged that, other than during this call and in an email sent to Welch following her resignation, she had never stated that she felt she was being discriminated against. (Id. at 90.)

On November 27, Gallagher emailed Plaintiff, explaining to her that he had tried to reach her the night before, but was informed that she had left for lunch and had not returned. (Ex. O Attached to Defs. MSJ.) Gallagher insisted that Plaintiff call him that day. (Id.) Plaintiff responded via email later that day that she was no longer comfortable speaking to anyone other than Bessant, noting that it has become "quite apparent" to her that "LA Fitness condones [Sharp's] behavior but promising to "be in the club doing [her] job." (Id.) Ostensibly unappeased, on November 28, 2008, Gallagher drove to the Staten Island facility to meet with Plaintiff to discuss her failure to meet her responsibilities, but he discovered that she was not at work. (Gallagher Deposition ("Gallagher Dep.") at 49.) At that point, Gallagher later testified that he said to himself, "enough is enough, we have to secure this club and move on." (Id.) When Plaintiff arrived at the facility some time later that day, Gallagher approached her with two options for moving forward; Plaintiff could either accept a demotion to WGM at Lake Success or resign. (Id. at 49-50.) According to Plaintiff, Gallagher stated that he was giving her the option to transfer because it was clear that she did not enjoy working under Sharp's jurisdiction, but Plaintiff also acknowledged that they had a discussion about her sales and the fact that they "ha[dn't] been spectacular." (Pl. Dep. at 20, 51-52.) At the time, Plaintiff believed that Gallagher's stated reasons for demoting her were true, (id. at 20), and in a November 30, 2008 email to Welch, even accepted that she must "of course take accountability, somewhat" for the facility's low sales numbers. (Ex. M Attached to Defs. MSJ.) Nonetheless, Plaintiff declined the demotion and opted to resign.

Following her resignation, Plaintiff sent an email to Bessant on November 28, 2008, noting that she was "unaware" that her TGM position was in jeopardy. (Ex. K Attached to Pl.

6

Opp.) And, although Plaintiff did not offer any specifics, she expressed her belief that she had been "treated unfairly," noted her "pending situation" with Human Resources, and stated that "LA Fitness does not want to deal with the issue first at hand." (Id.) On November 30, 2008 Plaintiff emailed Welch regarding her resignation. Plaintiff iterated many of the facts outlined above. (Id.) Plaintiff indicated in this email that she believed she had been treated the way she was because of her gender. (Id.) She also indicated that following her resignation, it was announced that the Staten Island facility would be hiring a WGM, which Plaintiff said would have alleviated her staffing issues. (Id.) Plaintiff received a response from Welch, who indicated that her office would investigate the matter. (Id.) There is no indication in the record as to whether an investigation occurred or what the outcome of any investigation might have been. Plaintiff testified at her deposition that although she always found Sharp's behavior discriminating and harassing, her November 30, 2008 email is the only email in which she specifically linked Sharp's treatment of her to discrimination. (Pl. Dep. at 89-90, 97, 100, 105-06, 113-14.)

III. DISCUSSION

Title VII discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). This same framework also applies to claims of age discrimination under the ADEA, *see Bucalo v. Shelter Island Union Free School Dist.*, ––– F.3d –––, 2012 WL 3240382, at *7 (2d Cir. Aug.10, 2012), and to discrimination and retaliation claims under the NYSHRL. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (citing *Dawson v. Bumble & Bumble*, 398 F.3d 211, 216–17 (2d Cir. 2005)) (discrimination); *Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 445 (S.D.N.Y. 2011) (citing *Borski v. Staten Island Rapid Transit*, 2011 WL 891740, at *1 (2d Cir. Mar. 16, 2011)). Under the *McDonnell Douglas* burden-shifting framework:

> [P]laintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. The burden of production then shifts to defendants, who must offer through the

7

> introduction of admissible evidence a non-discriminatory reason for their actions that, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the disputed employment action. Plaintiff then must show that the proffered reason was merely a pretext for discrimination, which may be demonstrated either by the presentation of additional evidence showing that the employer's proffered explanation is unworthy of credence, or by reliance on the evidence comprising the prima facie case, without more.

*Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal quotations and citations omitted).

A. <u>Plaintiff's Claims of Discrimination (Counts I, II, III, and IV)</u>[3]

Under Title VII, the ADEA and the NYSHRL, a plaintiff establishes a *prima facie* case of intentional discrimination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she held; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to [an] inference of discrimination. *See Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (Title VII); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107, 110 (2d Cir. 2010) (ADEA); *Spiegel*, 604 F.3d at 80 (NYSHRL). Although the evidence necessary to establish plaintiff's initial burden has been characterized by the Second Circuit as "minimal" and "de minimis," see *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (citing cases), it "is not non-existent." *Almond v. Westchester County Dept. of Corrections*, 425 F. Supp. 2d 394, 399 (S.D.N.Y. 2006). "[S]ummary judgment must be granted whenever the undisputed facts, viewed most favorably to the non-moving plaintiff, do not make out a prima facie case." *Id.* In addition, summary judgment is appropriate where the only evidence offered to prove the *prima facie* case

---

[3] The court notes that because individuals are not liable under Title VII and the ADEA, to the extent Plaintiff asserts claims against Sharp pursuant to those statutes, summary judgment is warranted. *See Rozenfeld v. Dep't of Design and Const. of City of New York*, 2012 WL 2872157, at *6 (S.D.N.Y. Jul. 12, 2012) (noting that neither Title VII nor the ADEA provides for individual liability) (citing *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004) ("[W]e note that individuals are not subject to liability under Title VII.") (internal quotations and citations omitted) *and Cherry v. Toussaint*, 2002 WL 31479004, at *1 (2d Cir. Nov. 1 2002) ("[T]he ADEA precludes individual liability.").

is conclusory and insufficiently particular to permit a defendant to respond, since "[t]o allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all . . . cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

1. Plaintiff has established a *prima facie* case of discrimination under Title VII, the ADEA, and the NYSHRL

Defendants do not appear to contest that Plaintiff is a member of a protected class, has suffered an adverse employment action, or that the adverse action took place under circumstances that give rise to an inference of discrimination. Rather, they argue only that Plaintiff has not established a *prima facie* because she did not possess the basic skills necessary to perform as a TGM and has therefore failed to demonstrate that she was qualified for the position. In support, Defendants point to sales statistics from Plaintiff's tenure as TGM, indicating that she had among the lowest, or in some cases the lowest, sales out of all of the facilities in her district. However, as the Second Circuit has "long emphasized," "the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate non-discriminatory basis for its decision." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001). Thus, a plaintiff "need not show perfect performance or even average performance." *Id.* (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)). Instead, a plaintiff "need only make the 'minimal showing' that '*she possesses the basic skills necessary for performance of [the] job.*'" *Id.* (quoting *Owens v. New York City of Housing Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)) (emphasis in original). The court finds that Plaintiff has met her burden.

Plaintiff worked at LA Fitness for nearly two years, had always held positions in which sales constituted a large part of her job function, and was twice promoted into successively higher positions, at least once based, "in large part," on her ability to achieve sales goals. (Defs. SOF ¶¶ 2, 6.) On this record, the court has little difficulty in concluding that Plaintiff has

9

demonstrated the "minimal qualifications" required for her *prima facie* case. *See Gregory*, 243 F.3d at 696 (finding that plaintiff had established that she was "minimally qualified" where the employer had "retained the plaintiff for a significant period of time and promoted her").[4]

2. <u>Plaintiff has failed to demonstrate that Defendants' Legitimate Non-Discriminatory Reason for Demoting her was a Mere Pretext</u>

Assuming then, that Plaintiff has established her *prima facie* case, the burden shifts to Defendants to articulate a legitimate non-discriminatory reason for their actions. *See Heyman*, 198 F.3d at 72. Meeting that challenge, Defendants have asserted, based on sales data from Plaintiff's tenure as TGM, that Plaintiff was demoted for not achieving sales goals, and because the facility she managed was often ranked at or near the bottom in sales when compared to other facilities in her district. (Ex. N Attached to Defs. MSJ; Pl. Dep. at 103 (testifying that under Plaintiff's management, the Staten Island facility was only meeting 25 percent of its sales goals while the national average was 50 percent).) In addition, Defendants assert that Plaintiff was demoted for failing to maintain staffing levels and not properly handling her day-to-day responsibilities. (*See* Gallagher Dep. at 49-50 (noting that "it was obvious that [Plaintiff] was spinning out of control and . . . wasn't able to handle the responsibilities.").) Plaintiff does not dispute the accuracy of this information, noting at her deposition that she only met her daily sales goals approximately "65 percent" of the time, and acknowledging to Gallagher that her sales numbers "were not spectacular" when she was notified of her demotion. (Pl. Dep. at 48,

---

[4] The court notes that many of the parties' arguments regarding pretext could apply with equal force to the fourth prong of the *prima facie* case, *i.e.*, whether Plaintiff has demonstrated that her demotion occurred under circumstances giving rise to an inference of discrimination. However, given this "nebulous standard" and the "de minimis" burden placed on a plaintiff to establish a *prima facie* case, it is more appropriate to assume that Plaintiff has established her *prima facie* case and address these arguments in its discussion of pretext below. *O'Connor v. Viacom Inc./Viacom Int'l Inc.*, 1996 WL 194299, at *4 (S.D.N.Y. Apr. 23, 1996) (finding it "expeditious to simply concede the existence of the fourth element" and proceed to the next step of the *McDonnell Douglas* framework); *see also Collins v. New York City Transit Auth.*, 305 F.2d 113, 118 n .1 (2d Cir. 2002) (noting that issues regarding the fourth element of the *prima facie* case and pretext "tend to collapse as a practical matter under the *McDonnell Douglas* framework").

52, 103.)  Given Defendants' facially non-discriminatory justifications for Plaintiff's termination, the burden again falls to Plaintiff to demonstrate the existence of a material fact as to whether the reasons proffered by Defendants are mere pretexts for a discriminatory motive.

Plaintiff's evidence of pretext essentially falls into two categories: Sharp's discriminatory remarks directed at Plaintiff and incidents where Plaintiff observed that younger males received preferential treatment.  The court will address each category separately.

### a. Plaintiff Has Not Establish Pretext Based on Sharp's Discriminatory Remarks

To establish discriminatory intent, Plaintiff relies on a series of comments allegedly made by Sharp.  Specifically, Plaintiff testified that over the two years she worked at LA Fitness, Sharp commented that "females," and Plaintiff in particular, "can't take credit cards," that women "didn't know how to do the job" and were not "tough enough," and that he visited the Staten Island facility because "there are a lot of pretty things to look at." (Pl. Dep. at 24-25, 45-46, 61.)  Sharp also allegedly passed by Plaintiff while she was training and commented that "the old lady can't work out."  (Id. at 39-40.)

Notwithstanding Sharp's inappropriate comments, Plaintiff does not appear to dispute that he played no role in the decision to demote her and points to no evidence that would indicate otherwise.  To the contrary, both Plaintiff and Gallagher's testimonies suggest that the decision to demote Plaintiff was made by Gallagher alone.  (Pl. Dep. at 87; Gallagher Dep. at 49.)  Plaintiff indicated that no one else was present when Gallagher informed her of her demotion and Gallagher's testimony indicates that her demotion was borne from his frustration with Plaintiff's failure to meet her responsibilities and her accompanying inaccessibility.  (*See* Pl. Dep. at 19-20, 53, 87; Gallagher Dep. at 49 (stating that after having been unable to reach Plaintiff by phone, Gallagher drove to Staten Island to meet with Plaintiff only to find that she wasn't there, at which point he decided that "enough is enough," and told Plaintiff of her options to either accept a demotion or resign when "she showed up a couple of hours later.").)  Nor

11

does Plaintiff allege that Gallagher in any way discriminated against her. (*See* Pl. Dep. at 79-80 (Plaintiff testifying that Gallagher never made a comment to her regarding her age or gender and that, in fact, she did not believe that any one at LA Fitness other than Sharp had ever discriminated against her.) Finally, Plaintiff acknowledged that the justifications Gallagher provided to her for her demotion and transfer were both correct; she had, in fact, not been meeting sales expectations and did not enjoy working with Sharp. (Pl. Dep. at 52.) Under these circumstances, Plaintiff cannot establish, via Sharp's comments, that Gallagher's justifications for Plaintiff's demotion masked a discriminatory purpose.[5] *See Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 536 (E.D.N.Y. 2006) ("'[S]tatements made by nondecisionmakers, or statements made by decisionmakers unrelated to the decisional process itself' do not constitute sufficient evidence to support a claim of . . . discrimination.") (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J. concurring); *see also John v. Bridgeport Bd. of Educ.*, 2011 WL 1106708, at *11 (D. Conn. Mar. 22, 2011) (finding that plaintiff failed to present sufficient evidence of pretext in part because she had "not alleged that anyone . . . who played a role in the decision not to promote her ever made any comments regarding her race, gender or age, or took any actions indicating racial, gender or age-based animus.").

  b. <u>Plaintiff Has Not Established Pretext Based on the Alleged Preferential Treatment Received By Younger Male Employees</u>

Plaintiff also claims that the justifications for her demotion are mere pretext as

---

[5] Plaintiff also argues that Sharp sabotaged her by transferring a member of her staff to another facility. Plaintiff, however, offers no facts surrounding the circumstances of that transfer and admitted that her staffing issues stemmed, at least in part, from circumstances beyond Sharp's control. (*See id.* at 104) (Plaintiff testifying that she would schedule interviews to alleviate staffing issues but that "no one showed up."); *see also* Ex. G Attached to Defs. MSJ (Plaintiff noting in an email that her WGM "expressed that he was stepping down").) In any event, as Sharp had no input in the decision to demote Plaintiff, his transfer of a member of Plaintiff's staff does not establish that Gallagher's reasons for Plaintiff's demotion were pretext.

demonstrated by the preferential treatment provided to younger male managers. More to the point, Plaintiff asserts that these managers – who Plaintiff named at her deposition – were promoted when asked, moved to different clubs at their request, came in late, disappeared for days, and took drugs and were arrested in the club, all without reprimand or repercussion. (Pl. Dep. at 21.) Plaintiff further asserted that many of these managers had previously served time in prison. (Id. at 28.)

As a preliminary issue, Defendants argue that Plaintiff has not demonstrated that these individuals are similarly situated to her. Plaintiff was allegedly demoted for poor sales, but she has not demonstrated that any of these individuals had similar sales numbers and yet were treated differently. In fact, Plaintiff has provided no evidence as to what these younger male managers' sales numbers actually were or for how long their sales numbers suffered, and even admitted at her deposition that she "didn't watch the [sales] numbers [of other clubs], to be quite honest." (Id. at 50.) Given the lack of any sales data regarding these younger male managers, the court agrees with Defendants that, on the record before it, Plaintiff has failed to establish that these younger male managers were in the same position as she – someone who was demoted based on poor sales performance.[6] *See Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) ("A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.") (internal quotation marks omitted).

Even assuming, however, that these managers were similarly situated to Plaintiff, Plaintiff's allegations fall far short of meeting her burden. First, despite Plaintiff's allegation that

---

[6] The court notes that Defendants submit evidence demonstrating that Sharp was also given the option of either accepting a demotion or forced resignation following poor sales performance on his part. (Defs. SOF ¶¶ 45-47.) Sharp and Plaintiff, however, had different job titles and very well might have had different responsibilities and/or job expectations. Thus, the court finds that Sharp's demotion is of little probative value in determining whether Plaintiff was treated the same way as similarly situated TGMs. However, as discussed, Plaintiff provided no evidence to indicate that any similarly situated male TGM was treated the same or differently based on sales numbers, and has thus failed to carry her burden on this issue.

13

these managers' were abusing drugs in the clubs and had prison records, Plaintiff did not testify whether any of her superiors were aware of such conduct, did not say whether any of these individuals were ever disciplined, and admitted that she never reported any of this information to her superiors, either because she believed it to be "open knowledge" or because she "didn't want to get involved." (Id. at 24, 33.)  Second, as to Plaintiff's claims that other managers were allowed to take vacation without prior notice or to come in late, Plaintiff testified that in the one instance where she personally observed a male co-worker coming in late and brought it to Sharp's attention, that Sharp eventually addressed the issue.  (Id. at 23.)  Third, although Plaintiff testified that she believed a former supervisor – not Sharp – excluded her from certain meetings, Plaintiff later admitted that the supervisor never directed her not to attend meetings.  In fact, Plaintiff did attend the meetings, and testified that any meeting she missed was due to the fact that she "wasn't in the building when those [meetings] occurred." (Id. at 36-37.)  Fourth, although Plaintiff argues that her younger male counterparts were allowed to transfer to other facilities at their request, she offers no specifics regarding how often these individuals requested transfers, how often such requests were granted, or what other circumstances, if any, surrounded these requests.  (Id. at 69-70.)  And, in any event, although Plaintiff was denied a second transfer in the less than two years she had worked for LA Fitness, she was granted her request to transfer to the Staten Island facility to be closer to her home.  (Sharp Deposition ("Sharp Dep.") at 74.)

     In sum, in the court's view, Plaintiff has offered little more than speculation and vague allegations of similarly-situated employees receiving more favorable treatment, many of which are controverted by Plaintiff's own testimony.  Under such circumstances, Plaintiff's allegations are simply insufficient to satisfy her burden and demonstrate that the reasons proffered by Defendants for her demotion were mere pretext.  *See Alam v. HSBC Bank USA, N.A*, 2009 WL 3096293, at *11 (S.D.N.Y. Sept. 28, 2009) ("While a court must interpret all evidence in favor of the plaintiff, it need not blindly accept the plaintiff's testimony where that testimony is largely

14

unsubstantiated and is contradictory or incomplete.") (citing *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Civ. 2005)); *Adams-Martin v. Connecticut Dep't of Dev. Servs.*, 2012 WL 878306, at *13 (D. Conn. Mar. 14, 2012) (finding plaintiff's speculative and unsubstantiated allegations of similarly-situated employees receiving favorable treatment insufficient to establish that defendant's non-discriminatory reason for her termination was a pretext). As the court finds that Plaintiff has not proffered sufficient evidence to raise a genuine issue of material fact as to whether her demotion was motivated by discriminatory animus, it grants Defendants' motion for summary judgment as to Counts I through IV.

B. Plaintiff's Claim of Retaliation (Count V)

As indicated, retaliation claims brought pursuant to NYSHRL are subject to the same burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green. Ballard v. Children's Aid Soc'y*, 781 F. Supp. 2d 198, 206 (S.D.N.Y. 2011). To establish a *prima facie* case of unlawful retaliation under the NYSHRL, a plaintiff must show that: (1) she engaged in a protected activity; (2) her employer was aware of this activity; (3) the employer took adverse employment action against her; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Vito v. Bausch & Lomb, Inc.*, 2010 WL 5129223, at *3 (2nd Cir. Dec. 17, 2010) (citing *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006)).

The parties focus their attention on the fourth prong, *i.e.*, whether Plaintiff has established a causal connection between her demotion and her complaint about discrimination. As an initial matter, the court notes the incredibly close proximity between Plaintiff's phone call to Human Resources on November 24 or 25 of 2008 and her subsequent demotion, which occurred only a few days later. Thus, were temporal proximity the sole criterion for establishing causation for a retaliation claim, Plaintiff would be successful. *See Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (finding causal connection based on the fact that only twenty days had elapsed between protected activity and termination); *Treglia v. Town of Manlius*, 313 F.3d 713,

15

721 (2d Cir. 2002) (one month gap sufficient to establish required causal link for a *prima facie* case).

Unfortunately for Plaintiff, "other factors may be considered to establish causation or its lack." *Summa v. Hofstra Univ.*, 2011 WL 1343058, at *22 (E.D.N.Y. Apr. 7, 2011). Indeed, "[w]hile general corporate knowledge of protected activity suffices to satisfy the second element of a retaliation claim, the extent of the actual decisionmaker's knowledge may be relevant to the causation prong." *Id.* As a result, the "lack knowledge on the part of a decisionmaker 'is admissible as some evidence of lack of a causal connection, countering plaintiff's circumstantial evidence of proximity.'" *Id.* (quoting *Gordon*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Sundaram v. Brookhaven Nat'l Lab.*, 424 F. Supp. 2d 545, 584 (E.D.N.Y. 2006) (stating that "there is no evidence that any of the decisionmakers [were] aware of the plaintiff's protected activity and thus no evidence of a causal connection between the protected activity and the defendant's hiring decision"). In addition, district courts have held that, "with regard to the causation prong of the prima facie standard, absent any evidence to support an inference that the decisionmakers knew of plaintiff's complaints, plaintiff cannot rely on circumstantial evidence of knowledge as evidence of causation." *Id.* (internal quotation omitted); *see also Philippeaux v. Fashion Inst. of Tech.*, 1996 WL 164462, at *6 (S.D.N.Y. Apr. 9, 1996) (plaintiff must demonstrate "not only that [the school] as an entity knew of his engagement in the protected activity, but also that the actual decisionmakers knew about it as well").

Here, Plaintiff presents no evidence that Gallagher was aware that she had placed a phone call to Human Resources complaining of discrimination just a few days before he discussed her demotion with her. To the contrary, Gallagher submitted a sworn affidavit to the court stating that "[a]t the time [he] informed [Plaintiff] of her demotion, [he] had no knowledge of any alleged complaints of age discrimination or sex discrimination that [Plaintiff] claims to have filed with LA Fitness." (Ex. P Attached to Defs. MSJ at 2.) Moreover, there is no evidence that Gallagher could have learned of the complaint from Sharp, who likewise testified that he had no

knowledge that Plaintiff had ever made a complaint that she had been the victim of discrimination. (*See* Sharp Dep. at 64.) As Plaintiff offers nothing to refute these statements and the court is aware of no evidence from which to impute Gallagher's awareness of Plaintiff's protected activity, Defendants have successfully "counter[ed] [P]laintiff's circumstantial evidence of proximity." *Summa*, 2011 WL 1343058, at *22 (quoting *Gordon*, 232 F.3d at 117). Accordingly, the court finds that there is insufficient evidence to establish a causal connection between Plaintiff's protected activity and her subsequent demotion.

Persevering, Plaintiff argues that her November 11, 2008 complaint against Sharp, of which Gallagher was aware, should constitute protected activity sufficient to establish causation. That complaint, however, made no mention of any alleged age or gender discrimination. (*See* Ex. M Attached to Defs. MSJ.) Rather, as Plaintiff indicated at her deposition, at no time before her call to Human Resources on either November 25 or November 26 of 2008 had she stated that she felt she was being discriminated against.[7] (Pl. Dep. at 90.) In the absence of any evidence that Gallagher was at any time aware that Plaintiff had complained of discrimination, the court finds that Plaintiff has failed to establish her *prima facie* case of retaliation and accordingly grants Defendants' motion for summary judgment as to Count V as well.

C. Hostile Work Environment

Plaintiff also appears to allege that Sharp's remarks in the workplace subjected her to a hostile work environment. At the outset, however, the court notes that it is unclear under which specific cause of action in Plaintiff's complaint her hostile work environment claim arises. Regardless, as Plaintiff appears to have alleged that she was subjected to a hostile work

---

[7] The conclusion that Plaintiff's complaint against Sharp was based on his abusive attitude towards all of the TGMs and not on any discrimination directed at Plaintiff is bolstered by Plaintiff's description of the conference call that prompted her to file the complaint. Plaintiff testified that on that call, Sharp "said that we [the TGMs] were all fucking assholes and if none of us could get the job done, we knew where the door was, and if none of us can work for $10 an hour . . . we can also leave and we can go and call fucking H.R." (Pl. Dep. at 43.) Plaintiff said the call was "all cursing, screaming, and then [she] finally hung up." (Id.)

17

environment, and as all parties addressed the issue in their motion papers, the court will do so as well.

The court begins with well-established principles. To demonstrate a hostile work environment, a plaintiff must show: (1) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that a specific basis exists for imputing the objectionable conduct to the employer. *Alfano v. Costello*, 294 F.3d 365, 373-74 (2d Cir. 2002). The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. *Id.* (citing *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001)). As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

In determining whether a particular work environment is "hostile," the Supreme Court has advised courts to apply the following relevant factors: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance". *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 23 (1993); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000). "Finally, it is 'axiomatic' that in order to establish a . . . hostile work environment [based on your membership in a protected class]. . . a plaintiff must demonstrate that the conduct occurred because of her [membership in that protected class]. *Alfano*, 294 F.3d at 374.

On balance the court finds that Plaintiff has failed to meet this threshold. First, the court finds that Sharp's comments were more in line with an "offensive utterance." It is clear that Sharp's comments were in no way physically threatening and, except for his comments regarding Plaintiff's ability to take credit cards and her ability to lift a large amount of weight because of her age, do not appear to have been directed at Plaintiff's own abilities. Second,

Plaintiff herself testified that Sharp's comments in no way interfered with her job and she attributed none of the problems she experienced regarding her staff or sales to Sharp's offensive comments. (*See* Pl. Dep. at 61-62, 64.) Finally, the court finds that these four instances of flippant comments over the course of two years is simply insufficient to constitute a change in Plaintiff's "terms and conditions of her employment" such that she could establish a hostile work environment. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (noting that to establish a hostile work environment claim a plaintiff must proffer evidence of conduct that is severe or pervasive enough to create an "objectively hostile or abusive work environment," such that "a reasonable person would find [it] hostile or abusive."); *see also Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) ("Generally, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.") (internal quotation marks omitted). Accordingly, the court grants Defendants' motion for summary judgment on these grounds as well.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (Document No. 21) is GRANTED. The Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order and close this case.

SO ORDERED.

                                          /s/
                               SANDRA L. TOWNES
                               United States District Judge

Dated: Sept. 28 , 2012
        Brooklyn, New York